IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MINDY K. SLOOP, | ) | Case No. 05-53914 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MEMORANDUM OPINION**

On December 21, 2005, the United States Bankruptcy Administrator (the "Bankruptcy Administrator") filed a motion to dismiss the Chapter 7 bankruptcy case of Mindy K. Sloop (the "Debtor") for substantial abuse of the Bankruptcy Code under Section 707(b). The Court held a hearing on this matter on April 25, 2006. Robyn C. Whitman appeared on behalf of the Bankruptcy Administrator, and C. Edwin Allman, III appeared on behalf of the Debtor. After consideration of the motion to dismiss, the evidence presented at the hearing, the arguments of counsel, and the relevant law, the Court will grant the Bankruptcy Administrator's motion to dismiss the Debtor's case.

**I.   BACKGROUND**

On October 14, 2005, the Debtor filed her Chapter 7 bankruptcy petition. The Debtor listed primarily consumer debts on her schedules, mostly consisting of unsecured indebtedness of $78,224.76, a mortgage totaling $207,100.50, and a vehicle lien totaling $14,226.72. As of the date of the petition, the Debtor was employed at Sara Lee Corporation earning a net monthly income[1] of $3,931.00.[2] The Debtor is a fifty-two year old single woman with no dependents.

---

[1] During the April 25, 2006 hearing, three different cash flow projections for the Debtor were submitted into evidence. The first projection comes from the amended Schedule I, showing monthly income, and the amended Schedule J, showing monthly expenses, filed by the Debtor on February

The Chapter 13 trustee determined that the Debtor's monthly expenses total $3,548.00. After meeting with the Chapter 13 trustee, the Debtor amended her Schedule J to reflect monthly expenses of $3,548.65. After reviewing the Debtor's expenses and hearing the evidence, the Court has determined that some of the Debtor's listed expenses are not reasonable and necessary. The Debtor's monthly expenses total $3,279.00.[3]

The Debtor's bankruptcy was mainly the result of credit card debt that accumulated over the span of a few years. The Debtor appears to have an affinity for shopping, and she testified that she only focused on whether she could pay her minimum credit card payments each month.[4] As the Debtor continued to spend, this cycle of debt spiraled out of control.

---

10, 2006. The second projection comes from the cash flow analysis presented by the Debtor at the hearing. The third projection comes from a letter dated January 25, 2006, from the Chapter 13 trustee, which contains the trustee's cash flow analysis. These three cash flow projections, and the Court's analysis of them after hearing the evidence, are shown on attached Supplement A. The income and expense amounts used in this opinion are derived from that analysis.

[2]The Debtor nets $3,545.00 per month from her employer. The Debtor testified that she typically receives a tax refund of $4,500.00 to $6,000.00 per year. Adding a minimum amount from tax refunds ($383.00), and the amounts that the Debtor causes to be withdrawn from her paycheck for health club dues ($25.00) and 401k contribution ($109.00), the Debtor's total monthly income is $3,931.00. This figure is slightly higher than the `amount calculated by the Chapter 13 trustee.

[3]As shown on attached Supplement A, the Court adjusted several of the Debtor's listed Schedule J expenses. The Court reduced the amount allocated for the Debtor's electricity and heating fuel from $300.00 to $234.00 (the Debtor testified that she did not use $101.00 of natural gas in the summer months), reduced the water and sewer allocation from $80.00 to $30.00, increased the food allocation from $210.00 to $300.00, reduced the clothing and personal care allocation from $150.00 to $100.00, reduced the medical and dental allocation from $275.00 to $100.00, reduced the transportation allocation from $110.00 to $0.00, reduced the recreation allocation from $75.00 to $50.00, reduced the miscellaneous and personal care allocation from $250.00 to $100.00, and reduced the disability insurance allocation from $160.00 to $0.00 (the Debtor testified that this was actually a contribution to a money market account).

[4]Five of the Debtor's seven credit cards had high interest rates. The rates are as follows: 24.99%, 24.24%, 20.49%, 21.6%, 10.4%, 10.4%, and 27.24%.

The Debtor attempted to manage some of her credit card debt outside of bankruptcy. The Debtor refinanced her home in October of 2004 and used the proceeds of the loan to pay off her then-existing first and second mortgages and to pay $8,995.42 on credit card bills.[5]

## II.   DISCUSSION

The Bankruptcy Administrator alleges that the Debtor is substantially abusing the Bankruptcy Code on the basis that the filing of her petition is an attempt to take unfair advantage of her creditors. The primary grounds for the Bankruptcy Administrator's allegation are that the Debtor incurred debt beyond her ability to pay and that she is able to make substantial repayment on her unsecured debt.

Section 707(b) of the Bankruptcy Code provides that the Court may dismiss a case filed by a Chapter 7 debtor whose debts are primarily consumer debts, if the Court finds that granting the debtor relief would be a substantial abuse of the Bankruptcy Code. 11 U.S.C. § 707(b). The burden of proving substantial abuse rests on the moving party. In re Vansickel, 309 B.R. 189, 213 (Bankr. E.D. Va. 2003). Moreover, there is a statutory presumption in favor of granting the relief requested by the debtor in determining whether to dismiss a case. 11 U.S.C. § 707(b). As the leading treatise on bankruptcy states:

> [T]he statutory presumption is obviously meant to be something more than simply a rule about the burden of proof, since that burden would already have been on the party seeking to dismiss the case. . . . It appears that the presumption is an

---

[5]The Debtor testified that she refinanced her home because it cut her existing mortgage payment in half. The Debtor refinanced her home by signing a fifteen-year promissory note with an adjustable interest rate tied to the prime rate of interest. The promissory notes requires the Debtor to make interest-only payments for fifteen years. There is a balloon payment due in 2019 for the principal balance of $206,000. The Debtor testified that if she still owed on the promissory note at that time (when the Debtor will be 65 years old), then she would either attempt to refinance or sell the property.

> indication that in deciding the issue, the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present.

6 Collier on Bankruptcy ¶ 707.04[5][a], p. 707-27 to 707-28 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed. Matthew Bender 2004). See also Harris v. United States Trustee (In re Harris), 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002)(noting that the lack of clarity in the statute was akin to inspired tergiversation and concluding that the burden of proof necessary to overcome the presumption was not "clear abuse," but was one of "substantial abuse" as stated in the statute).

Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991)(providing that Section 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, 2001 Bankr. LEXIS 1896 at *5 (Bankr. M.D.N.C. 2001)("Section 707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while denying a head start to the abusers."). In the Fourth Circuit, a "totality of the circumstances" test is used in making a determination of substantial abuse under Section 707(b) because it is consonant with Congressional intent to punish the abusers of the Bankruptcy Code and with the statutory presumption in favor of granting the relief requested by a debtor. Green, 934 F.2d at 573. Some of the relevant factors to be evaluated in the "totality of the circumstances" approach include:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

>(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
>(3) Whether the debtor's proposed family budget is excessive or unreasonable;
>(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>(5) Whether the petition was filed in good faith.

Id. at 572 (citations omitted). The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to repay is the primary factor to be considered." Id.

### A. Ability to Repay Debts

The Court finds that the Debtor has an ability to repay a significant portion of her debt. An appropriate method of evaluating whether a debtor has the ability to repay debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan. See, e.g., Shaw, 310 B.R. at 541 ("In contrast with the second factor of the 'totality of the circumstances' test, where 'ability to repay' analyzes the debtor's historical ability to repay debts, 'ability to repay' in this context analyzes the degree to which the debtor could pay creditors a significant portion of the debt under a Chapter 13 plan."). Although a number of courts have considered the percentage of total indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test. As stated by one bankruptcy judge:

>While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts.

In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000).

The Bankruptcy Administrator asserted that if the Debtor followed a more reasonable budget and reduced her discretionary spending, then the Debtor would be able to repay some of

5

her debts. Pursuant to the calculations made by the Chapter 13 trustee, the Debtor has $380.00 each month to repay creditors,[6] which could pay 17% of her unsecured claims.[7] The Court, however, finds that the Debtor has excess income of $652.00 per month,[8] which would yield a 30% dividend to unsecured creditors.

### B. Reasonableness of Budget

The Debtor's Schedule J budget is somewhat reasonable. A few the Debtor's expenses are unreasonable, including telephone expenses,[9] medical and dental expenses not covered by insurance,[10] and expenses for miscellaneous and personal care. The Debtor testified that she pays $75.00 per month for maid service; however, she did not include this as an expense on her amended Schedule J.

### C. Illness, Calamity, Disability, or Unemployment

The Debtor stipulated that her bankruptcy filing was not due to sudden illness, calamity, disability, or unemployment.

### D. Cash Advances and Consumer Purchases in Excess of Ability to Repay

---

[6] Letter dated January 25, 2006, from Kathryn L. Bringle, Chapter 13 trustee, to Robyn R. C. Whitman, attorney for the Bankruptcy Administrator.

[7] Given the circumstances of this case, a 17% dividend to unsecured creditors would be sufficient for this Court to dismiss the Debtor's case.

[8] See Supplement A.

[9] The Debtor pays $137.00 per month for telephone, which includes $43.00 for her parents' cell phones, $40.00 for her phone, $50.00 for her cell phone, and $4.00 long distance service.

[10] The Debtor testified that she had very high expenses for dental work in the previous months and that those expenses were not covered by her medical insurance but that she did not expect such expenses on a regular occurrence. The Debtor testified that the $275.00/month figure was too high.

The Bankruptcy Administrator contends that the Debtor incurred approximately $78,224.76 in unsecured debt when the Debtor did not have any reasonable expectation that she would be able to repay it. Incurring indebtedness without any reasonable expectation of being able to repay it is a factor for a court to consider when determining if a debtor is attempting to substantially abuse the Bankruptcy Code, but a court should not so broadly interpret this factor as to foreclose the availability of Chapter 7 relief to nearly all consumer debtors; rather, a debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with the Debtor's reasonable expectations of repayment at the time that the debt was incurred. Vansickel, 309 B.R. at 211. Indeed, nearly all debtors in bankruptcy have incurred obligations in excess of their ability to repay, and the bankruptcy court is mandated to adhere to the statutory presumption that a debtor is entitled to the relief originally sought. 11 U.S.C. § 707(b). Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns – all of which must be considered in light of whether a debtor is taking unfair advantage of creditors. Vansickel, 309 B.R. at 211.

The Debtor's total unsecured debt in this case is $78,224.76.[11] She has secured indebtedness on her house and vehicle of $221,327.00. In light of the total income of the Debtor over the past few years, this amount of debt is excessive. The Debtor took several vacations in the year preceding her bankruptcy filing, although she testified that most of the trips were taken at little or no expense to her. For one trip, however, she spent over $2,554.00 at Blue Dolphin

---

[11] The majority of the Debtor's credit card debt is old debt–four of her seven credit cards were incurred in the 1990s. Her most recent credit card was procured in 2003. However, she did continue to make credit card purchases until the date of her petition.

Dive Center on scuba diving equipment and lessons. Further, the Debtor spent over $5,000.00 on clothing in the year preceding the bankruptcy filing. The Debtor testified that she had gained over twenty-three pounds, which necessitated the purchase of a new wardrobe.

Although the credit card debt of the Debtor grew beyond her means to repay it over a period of years, it was just a <u>few</u> years, and the spending behavior that caused it continued unabated until she filed her bankruptcy. The Debtor testified that when she made purchases, she only considered whether she could make the minimum monthly payments due on her credit cards; she did not focus on the debt in its entirety. She testified that at the time that she made her purchases, she intended to repay the entire debt. In the last three years before her bankruptcy, any reasonable person would have known that the Debtor was spending beyond her means, and the Debtor admitted as much. The Debtor was willfully ignorant of her financial situation as her debts ballooned out of control.

The evidence presented by the Bankruptcy Administrator on this issue meets the burden of proof required to establish that the Debtor incurred debts beyond her ability to repay.

### E. Accuracy of the Debtors' Schedules

The inconsistencies in the Debtor's schedules are fairly inconsequential, and they were corrected when the Debtor filed her amended Schedules I and J. The only significant inaccuracy involves the Debtor's income. The Debtor listed gross income of $5,838.00 on amended Schedule I when her pay stub shows she has gross income of $5,545.00. The Debtor testified that she did not know how this mistake occurred. However, since indicating a higher income is detrimental to the Debtor in this matter, the Court does not believe that she intentionally submitted erroneous information or was attempting to mislead the Court.

The importance of having a debtor submit complete and accurate bankruptcy schedules is paramount; the bankruptcy system relies heavily on self-reporting by debtors. Mertz v. Rott (In re Mertz), 955 F.2d 596, 598 (8th Cir. 1992)("[T]he petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts."); In re Fauntleroy, 311 B.R. 730, 738 (Bankr. E.D.N.C. 2004) (emphasizing that the schedules and statement of current income and expenses are to reasonably and accurately reflect the debtor's true financial condition). "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987). Innocent mistakes in the form of a few minor omissions or errors might be forgiven; but multiple inaccuracies evidence "'a pattern of reckless and cavalier disregard for the truth'" and can lead to a finding that a bankruptcy petition was filed with fraudulent intent. Dean v. McDow (In re Dean), 299 B.R. 133, 140 (E.D. Va. 2003)(Section 727(d)(1) revocation of discharge proceeding)(citation omitted). Any amendment that a debtor makes to Schedules I and J subsequent to a motion to dismiss under 11 U.S.C. § 707(b) is viewed with inherent suspicion. In re Gullett, No. 03-10995, 2004 Bankr. LEXIS 1696 at *11 (Bankr. E.D. Ky. 2004); In re Lee, 162 B.R. 31, 43 (Bankr. N.D. Ga. 1993).

The Debtor misstated her income on Schedule I, but this error is not serious enough to affect a determination of substantial abuse of the Bankruptcy Code.

### F.  Good Faith

The Bankruptcy Administrator argues that the Debtor did not file her bankruptcy in good faith, mainly because the Debtor can afford to pay a substantial dividend to unsecured creditors.

9

An analysis of whether a petition was filed in good faith–for purposes of a Section 707(b) motion–concerns whether a debtor is misusing the bankruptcy process to achieve some illicit purpose. Kestell v. Kestell (In re Kestell), 99 F.3d 146, 149-50 (4th Cir. 1996)(finding a "substantial abuse of the Bankruptcy Code when the debtor filed solely to discharge obligations owed to his former spouse – not any other creditor – because favoritism among creditors is antithetical to the bankruptcy process and the Bankruptcy Code is not to be used as a method of advancing personal antagonisms against an ex-spouse). "Good faith" is defined as "a state of mind consisting in (1) honesty in belief or purpose, . . . or (4) absence of intent to defraud or seek unconscionable advantage." Black's Law Dictionary 713 (8th ed. 2004). See also Stewart v. United States Trustee (In re Stewart), 175 F.3d 796, 810 (10th Cir. 1999)(finding that a physician's opting for a lower paying job, disregarding his family support obligations, and buying a $26,000 vehicle instead of paying for those expenses – among other things – was sufficiently analogous to the old adage of "having your cake and eating it too" so as to call into question the debtor's good faith); In re Dominguez, 166 B.R. 66, 69 (Bankr. E.D.N.C. 1994)("Presumably, "good faith" [within the meaning of Section 707(b)] means subjective good faith.").

The Bankruptcy Administrator has demonstrated that the Debtor can afford to pay a substantial sum to unsecured creditors, thus establishing bad faith on the part of the Debtor. The Bankruptcy Administrator has shown that the Debtor recklessly ran up charges on her credit cards without having a realistic financial plan that would allow her to repay the debts.

## Conclusion

The Court believes that the Debtor has the ability to make a substantial effort to repay her debts. After weighing the totality of the circumstances surrounding the Debtors' bankruptcy

filing and determining that the Debtor has an ability to repay a meaningful amount of her debt, the Court finds that the Debtor's case constitutes a "substantial abuse" of the Bankruptcy Code within the meaning of 11 U.S.C. § 707(b).[12]

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

---

[12] At the hearing, the Debtor's counsel argued that the Debtor has only two options–to obtain a chapter 7 discharge or to be permanently saddled with her existing debts. Her options are limited, according to her counsel, because she cannot make the payments required in a chapter 13 plan. However, the Debtor may find that a Chapter 13 bankruptcy filed after October 17, 2005 (the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005) will afford her some relief.

## SUPPLEMENT A - DEBTOR'S CASH FLOW

|  | Amended I & J | Cash Flow | Chapter 13 | Court |
|---|---|---|---|---|
| **Income** | $5,838 | $5,458 |  | $5,458 |
| Add Aver. Tax Refund |  |  | 383 | 383 |
| Less Taxes & Soc. Sec. | 1,736 | 1,753 |  | 1,753 |
| Less Insurance | 139 | 108 |  | 108 |
| Less Health Club Dues | 25 | 25 |  | 0 |
| Less United Way | 10 | 10 |  | 10 |
| Less Mutual Fund Contrib. | 0 | 39 |  | 39 |
| Less 401K Contribution | 109 | 218[13] | 0 | 0 |
| Net Income | $3,819 | $3,305 | $3,928[14] | $3,931 |
| **Expenses** |  |  |  |  |
| Mortgage | $1,225 | $1,225 |  | $1,225 |
| Elec & Heating Fuel | 300 | 234 |  | 234 |
| Water & Sewer | 80 | 30 |  | 30 |
| Telephone | 130 | 137 |  | 130 |
| Cable | 76 | 77 |  | 76 |
| Home Maintenance | 100 | 0 | 100 | 100 |
| Food & Dining Out | 250 | 210 |  | 300 |
| Clothing & Personal Care | 150 | 100 | 150 | 100 |
| Gifts | 0 | 50 | 0 | 0 |
| Dry Cleaning | 50 | 0 | 50 | 50 |
| Medical & Dental | 275 | 0 | 275 | 100 |
| Transportation | 110 | 0 |  | 0 |
| Recreation | 75 | 0 |  | 50 |
| Maid | 0 | 75 |  | 0 |
| Homeowner's Insurance | 82 | 82 |  | 82 |
| Auto Insurance | 62 | 58 |  | 58 |
| Auto Loan | 0 | 366 | 0 | 366 |
| Auto Maintenance | 0 | 15 |  | 15 |
| Gas | 0 | 90 |  | 90 |
| Real Estate Taxes | 155 | 150 | 155 | 155 |
| Hecht's - CC repayment | 0 | 50 |  | 0 |
| Misc. & Personal Care | 250 | 0 |  | 100 |
| Disability Insurance | 160 | 160 | 0 | 0 |
| Home. Assoc. Dues | 18 | 18 |  | 18 |
| Total | $3,548 | $3,130 | $3,548 | $3,279 |
| **Net for Creditors**: | $ 271 | $ 175 | $ 380 | $ 652 |

---

[13] The Debtor's 401K contribution increased to $218.00 per month on January 1, 2006.

[14] The Chapter 13 trustee calculated net monthly income by adding $109.00 (401(k) contributions) and $383.00 (tax refunds) to net wages of $3,545.00, for a total of $3,928.00.

12

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:                                      )
                                            )
MINDY K. SLOOP,                             )        Case No. 05-53914
                                            )
        Debtor.                             )
_____)

PARTIES IN INTEREST

Mindy K. Sloop

C. Edwin Allman, III, Esquire

Robin C. Whitman, Esquire